J-S06031-16; J-S06032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: W.M.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.A. | No. 1295 MDA 2015 |

Appeal from the Order Entered July 2, 2015,
in the Court of Common Pleas of Centre County, Orphans'
Court, at No(s): 4045

| | |
|---|---|
| IN RE: T.L.S., JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.A., MOTHER | No. 1296 MDA 2015 |

Appeal from the Order Entered July 2, 2015,
in the Court of Common Pleas of Centre County, Orphans'
Court, at No(s): 4044-2015

| | |
|---|---|
| IN RE: T.L.S., JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.L.S., SR. | No. 1308 MDA 2015 |

Appeal from the Order Entered July 2, 2015,
in the Court of Common Pleas of Centre County, Orphans'
Court, at No(s): 4044

| | |
|---|---|
| IN RE: W.M.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.L.S., SR. | No. 1320 MDA 2015 |

Appeal from the Order Entered July 2, 2015,
in the Court of Common Pleas of Centre County, Orphans'
Court, at No(s): 4045

BEFORE: PANELLA, J., MUNDY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E:                    **FILED APRIL 05, 2016**

Appellants, S.A. ("Mother") and T.L.S. ("Father"), appeal from the orders entered July 2, 2015, in the Court of Common Pleas of Centre County, Orphans' Court Division, by the Honorable Jonathan D. Grine, involuntarily terminating the parental rights of Mother and Father to W.M.S. (born December 10, 2011) and T.L.S., Jr., (born February 18, 2014) (collectively "the Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Following a review of the record, we affirm.

The relevant facts and procedural history of this case are as follows:

> On September 10, 2013, W.M.S. was placed into the care and custody of paternal grandparents, [K.J. ("Paternal Grandmother") and W.J. ("Paternal Grandfather")], by Tthe Department of Youth and Family Services ("DYFS") in New Jersey, after being removed from the care of her biological parents, [Mother and Father]. The family first became involved with Centre County Children and Youth Services ("CYS") in April of 2013 when DYFS contacted CYS asking the agency to do a home safety assessment of [Paternal Grandmother]'s home. At this time, [Father] was in jail and [Mother] was unable to care for W.M.S. due to inadequate housing and drug addiction. In July of 2013, CYS received a referral indicating that [Mother] was taking drugs during her pregnancy with T.L.S., Jr. When CYS made contact with [Mother], they discovered she had been prescribed a one week supply of Suboxone on July 2, 2013. However, when she was drug tested by an agency caseworker on July 31, 2013, she tested positive for Suboxone and opiates. On September 9, 2013, CYS became aware that [Mother] was also participating in the Methadone program through State College Medical on a continuing basis.

> [In] February [of] 2014, T.L.S., Jr. was born at Mount Nittany Medical Center. He was then transferred to Geisinger Medical Center on February 23, 2014, due to his serious withdrawal symptoms from Methadone. CYS gained emergency custody on March 7, 2014 when T.L.S., Jr. was released from Geisinger Medical Center. On March 13, 2014, T.L.S, Jr. was adjudicated dependent.

On March 31, 2014, CYS received a referral concerning [Paternal Grandmother]'s drug use, lack of fuel oil in her home, and concerns that she was permitting [Mother and Father] to care for W.M.S. for extended periods of time. On April 1, 2014, CYS informed [Paternal Grandmother] that it could not support unsupervised time between W.M.S. and [Mother and Father] given the lack of follow through with goals previously established by DYFS, and reunification services had not commenced concerning T.L.S., Jr. On April 2, 2014, despite CYS' directives, [Paternal Grandmother] and [Father] filed a [c]ustody [a]greement returning legal custody of W.M.S. to [Mother and Father], while primary physical custody remained with [Paternal Grandmother]. On April 4, 2014, CYS learned that [Paternal Grandmother] had left the state and was not planning to return to Pennsylvania. That same day, CYS filed for and was granted emergency protective custody of W.M.S. A [d]ependency [p]etition was filed on April 8, 2014, and on April 16, 2014, W.M.S. was adjudicated dependent and placed in an approved foster home where she has since resided with her brother, T.L.S., Jr.

On April 16, 2014, formal reunification services began with Centre County Youth Service Bureau. In particular, the goals set for [Mother and Father] included: (1) to participate in the reunification/permanency services provided by YSB; (2) to cooperate and participate in the Family Connections Process; (3) demonstrate the ability to maintain her sobriety by refraining from using/abusing drugs (i.e., illegal drugs, non-prescribed drugs, misusing prescription medication, misusing any other substance) and alcohol; (4) make positive choices in order to demonstrate her ability to lead a healthy lifestyle appropriate for raising W.M.S. and T.L.S., Jr.; (5) demonstrate her ability to maintain housing and financial stability; and (6) demonstrate her ability to appropriately parent W.M.S. and T.L.S., Jr. and provide for their basic needs. During reunification, CYS and YSB stressed the importance of [Mother and Father] being open and honest with their caseworkers, specifically with respect to their prescription medications.

Supplemental Trial Court Opinion, filed January 29, 2016, 1-3.

On March 13, 2015, Mother's and Father's reunification services were terminated following a permanency review hearing. On April 7, 2015, and April 9, 2015, CYS filed termination petitions seeking to terminate Mother's and Father's parental rights to Children pursuant to section 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(2) (5), (8), and (b). The trial court held a termination hearing on July 2, 2015. At the hearing, Stacy Pribulka, a CYS caseworker, and Raelee Hulek, a reunification counselor for the Youth Service Bureau, testified. Counsel for Mother and Father were present at the hearing, but Mother and Father did not attend. By a decree dated July 2, 2015, the trial court terminated the parental rights of Mother and Father.[1]

On July 27, 2015, Mother and Father filed timely notices of appeal, along with concise statements of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). [2]

Mother raises the following issues on appeal:

1. The trial court erred in terminating the parental rights of Mother: Insufficient evidence was presented to demonstrate by a clear and convincing standard that the issues, which prompted [CYS]'s involvement continued to exist at the time of the hearing and could not or would not be remedied by Mother.

---

[1] In its Opinions in Response to Matters Complained of on Appeal, the trial court did not perform an analysis pursuant to Section 2511(b). On January 22, 2016, this Court directed the trial court to file supplemental opinions pursuant to Pa.R.A.P. 1925(a) containing the requisite Section 2511(b) analysis, and the trial court complied.

[2] This Court *sua sponte* consolidated the appeals.

Mother's Brief at 1.

Father raises the following issues on appeal.

1. Whether the orphans' court committed an abuse of discretion or error of law when it concluded that [CYS] established grounds for termination of parental rights under 23 Pa.C.S.A. §2511(a)(2), (a)(5) and/or (a)(8)?

2. Whether the evidence presented was insufficient to support the orphans' court's order terminating parental rights under 23 Pa.C.S.A. §2511(a)(2), (a)(5) and/or (a)(8)?

Father's Brief at 5.

We review the orders involuntarily terminating Mother's parental rights

according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d

at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, [165], 650 A.2d 1064, 1066 (1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa.Super. 2009).

This Court must agree with only one subsection of 23 Pa.C.S.A. § 2511(a), in addition to Subsection 2511(b), in order to affirm the

termination of parental rights. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, we review the orders pursuant to section 2511(a)(5) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(5) and (b).

Termination of parental rights under Section 2511(a)(5) requires that (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. **In re Adoption of M.E.P.**, 825 A.2d 1266, 1273-1274 (Pa. Super. 2003). This Court has held that a child's life, happiness and vitality cannot be put on hold until a parent finds it convenient to perform parental duties. **See In the Matter of the Adoption of A.M.B.**, 812 A.2d 659, 675 (Pa.Super. 2002).

Moreover, this Court has stated that after a child enters foster care, the parents have an "affirmative duty . . . to work towards the return of the child by cooperating with the Agency to obtain rehabilitative services necessary for them to be capable of performing their parental duties and responsibilities." **In re G.P.-R.**, 851 A.2d 967, 977 (Pa.Super. 2004). This duty must be timely discharged, because "a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **In re A.L.D.** 797 A.2d 326, 340 (Pa.Super. 2002).

Herein, Mother and Father argue the trial court erred in terminating their parental rights to the Children. Mother's Brief at 5; Father's Brief at 5. Regarding the first factor of Section 2511(a)(5), Mother and Father failed to dispute the time period in which the Children were removed from their care. With respect to the second factor of Section 2511(a)(5), the trial court found Father and Mother are unwilling and unable to remedy the issues which led to the removal of the Children from her care. Trial Court Opinion, filed August 13, 2015, at 5. Specifically, the trial court found:

> [Mother and Father] were provided over 2,000 hours of reunification services, yet they failed to satisfactorily meet any of their goals and never progressed to unsupervised visitation. [Mother and Father]'s participation in reunification services was inconsistent and neither took advantage of opportunities for additional contact on a regular basis by attending the children's medical appointments.
>
> Furthermore, [Mother and Father] did not demonstrate the ability to promote the development of the [C]hildren in that they did not consistently engage the [C]hildren in activities recommended by Early Intervention. Most importantly, neither parent demonstrated the open and honest behavior requested by CYS concerning their medications. During home visits, [Mother and Father] often spent a significant period of time searching their home for the medications. This was of serious concern to the reunification team as either child could find the medications and accidentally ingest them.

Supplemental Trial Court Opinion, filed January 29, 2016, at 3.

In making its determinations, the trial court relied on the testimony of Ms. Pribulka and Ms. Hulek. Ms. Pribulka testified that Mother and Father received notice of the termination hearing because she hand delivered it to Mother at their home on June 4, 2015. N.T., 7/2/15, at 4-5. Ms. Pribulka

previously contacted Mother and Father numerous times in April of 2013, August of 2013, and on February 19, 2014, following the birth of T.L.S. *Id.* at 9-10. Ms. Pribulka related that Mother and Father have "a history of being uncooperative with [CYS], not being truthful, not allowing workers into the home, giving false addresses, giving false information all together at times." *Id.* at 10.

Ms. Hulek testified that CYS requested to end reunification services with the family because CYS still has "serious concerns remaining" after CYS's extensive efforts to help and support Mother and Father. *Id.* at 59. Ms. Hulek stated that Mother missed seven visits with the Children and Father missed fourteen visits. *Id.* at 33. Ms. Hulek also revealed that Mother and Father attended only five out of thirteen of the Children's medical appointments. *Id.* at 34. Ms. Hulek explained that because the Children were receiving early intervention services, it was "very crucial" for the Children's exercises to be implemented in the home in order for them to be effective. *Id.* at 36-37. Ms. Hulek testified that Mother and Father hampered the Children's developmental needs in that they engaged in exercises with W.M.S during only five of their thirty-seven visits and during just thirteen out of their thirty-seven visits with T.L.S., Jr. *Id.* at 37. Also, Ms. Hulek testified that Mother attended twenty-six out of forty-three scheduled parent sessions and Father attended twenty-four out of forty parenting sessions. *Id.* at 44.

Ms. Hulek further observed that Mother and Father acted inappropriately during their visits with the Children. *Id*. at 34. For instance, Ms. Hulek explained that Mother and Father did not comply with the pediatrician's recommendation to limit the Children's sugar intake and otherwise provide them with a healthy diet. *Id*. at 38-39. Specifically, they repeatedly failed to feed T.L.S. his bottle and supplemental cereal altogether and at times either overfed W.M.S. or provided her with only candy at mealtime. *Id*. In addition, Ms. Hulek added that Mother and Father admitted to smoking in their home even though it was recommended that they refrain from doing so due to T.L.S., Jr.'s withdrawal symptoms after birth. *Id.* at 35.

The record supports the trial court's conclusions as clear and convincing evidence therein showed that termination was appropriate. Mother and Father failed to remedy the conditions that led to the Children's placement, even though CYS made the necessary services and the opportunities to use them readily available to them. Ultimately, Mother and Father failed to complete their objectives and resolve their problems.

With regard to the last factor of section 2511(a)(5), the trial court found that the termination of Mother and Father's parental rights pursuant to section 2511(a)(5) is in the best interests of the Children. Trial Court Opinion, filed August 13, 2015, at 6. The trial court found that Mother and Father are unable to provide the Children with safety, permanency and

stability in their lives. *Id.* Indeed, Ms. Hulek testified that she had serious concerns regarding Mother's and Father's ability to parent, for they had never been able to progress to unsupervised visits with their children due to their repeated failure to meet the Children's needs. N.T., 7/2/15, at 36. The trial court noted the Children are "thriving in their foster home where they are provided with the consistency Mother [and Father have] been unable or unwilling to provide." Trial Court Opinion, filed September 13, 2015, at 6. The trial court also stressed the Children "seek out the foster parents for support and comfort when they are injured, ill or upset." *Id.* Furthermore, the trial court determined that "the [C]hildren have been with the current foster family for a significant portion of their lives and have developed a strong bond with the foster family." *Id.* Thus, the trial court's termination of Mother's and Father's parental rights would best serve the needs and welfare of the Children pursuant to Section 2511(a)(5). *In re Adoption of M.E.P.*, *supra.*

Next, the prevailing caselaw requires us to engage in a discussion of whether the requirements of Section 2511(b) have been satisfied. Whereas the focus in terminating parental rights under Section 2511(a) is on the parent, pursuant to Section 2511(b) the child is the focal point. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). Under Section 2511(b), we examine whether termination of parental rights would best serve the developmental, physical, and emotional needs and

welfare of the child. *In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *Id.* at 1287 (citation omitted). The court also must discern the nature and status of the parent-child bond, while giving the utmost consideration to the effect that permanently severing that bond may have upon the child. *See id.*

With regard to W.M.S.'s bond with Mother and Father, the trial court stated:

> W.M.S. is four (4) years old and she has been removed from [Mother's and Father's] care in and out-of-home placement twice. Since reunification services ended, [Mother and Father] only attended three (3) out of nine (9) visits with [the] Children. When W.M.S. would be told she would be going to a visit with biological parents, she would just say "okay." At one point when W.M.S. was told she would be going to a visit with "mommy" and "daddy," she questioned who that was. W.[M.]S. refers to [Mother] as "[T.L.S.]'s mother. During visits with [Mother] when foster mother left the room, W.[M.]S. would ask [Mother] repeatedly, "Where did mommy go?" She consistently refers to foster parents as "mommy" and "daddy." Concerns were raised to [Mother and Father] that they were overfeeding W.[M.]S. and that some sugar should be cut out of her diet to help relieve a constipation issue W.[M.]S. was having. Despite being aware of these concerns and having the specific need[s] explained, [Mother and Father] still struggled to address the issue. W.[M.]S. would often be tired, irritable, cranky, and hungry after visits with [Mother and Father].
>
> In the foster home, W.M.S. is receiving the stability, consistency, and safety that she needs. W.M.S. is happy, healthy, and comfortable in foster parents' care, and she looks to foster parents to meet her needs. For the foregoing reasons, and based upon the testimony and evidence presented at the termination hearing, the [trial court] found as follows, pursuant the guidance set forth in section 2511(b): the emotional bonds between [Mother and Father] are tenuous; termination of

- 13 -

[Mother's and Father's] parental rights would not have a detrimental effect on W.M.S.; termination of [Mother's and Father's] parental rights provides W.M.S. with the permanency which is in her best interest; and termination of [Mother's and Father's] parental rights provides W.M.S. with the means to continue her strong emotional bonds with her foster parents.

Supplemental Trial Court Opinion, filed January 29, 2016, at 5-6.

When considering T.L.S.'s bond with Mother and Father, the trial court found:

T.L.S. Jr. has been in foster care since he left the hospital after his birth. Understandably, T.L.S., Jr. is exceedingly attached and emotionally bonded with his foster parents. When he would be taken away from his foster mother to attend a visit, he would cry and scream due to the separation. During visits in which foster mother participated, he would look to foster mother to fulfill any of his needs. Even when [Mother and Father were] attempting to engage him in play, he would run to foster mother if he needed anything. He refers to foster mother as "ma." When [Mother and Father] would attempt to talk with him, he would not look at them and he would hide around his foster mother. If [Mother and Father] would try to hold him, he would cry and scream. On one occasion, T.L.S., Jr. tripped and fell during a visit and ran to foster mother for help, despite [Mother and Father]'s attempt to comfort him. During visits, [Mother and Father] would miss giving T.L.S., Jr. a bottle completely and would feed him late, despite being provided with a schedule which specifically outlined when bottles should be given and when meals should be provided. T.L.S., Jr. would often be tired, irritable, cranky, and hungry after visits with [Mother and Father].

In the foster home, T.L.S., Jr. is receiving the stability, consistency, and safety that he needs. T.L.S., Jr. is happy, healthy, and comfortable in foster parents' care, and he looks to foster parents to meet his needs. For the foregoing reasons, and based upon the testimony and evidence presented at the hearing, the [trial court] found as follows, pursuant the guidance set forth in Section 2511(b): the emotional bonds between [Mother and Father] and T.L.S., Jr. are tenuous; termination of [Mother and Father's] parental rights would not have a

- 14 -

detrimental effect on T.L.S., Jr.; termination of [Mother's and Father's] parental rights provides T.L.S., Jr. the permanency which is in his best interest; and termination of [Mother and Father's] parental rights provides T.L.S., Jr. with the means to continue his strong emotional bonds with his foster parents, which have been in existence since his birth.

Supplemental Trial Court Opinion, filed January 29, 2016, at 6-7.

Ms. Pribulka and Ms. Hulek testified that termination of Mother's and Father's parental rights is in the Children's best interest. N.T., 7/2/15 at 29, 64-65. Ms. Pribulka stated that while W.M.S. had experienced developmental delays, once she was placed with foster mom she made "great progress over this past year." *Id.* at 28-29. Moreover, Ms. Pribulka testified that the Children have bonded with their foster parents. *Id.* at 29. Ms. Hulek also related that the Children are thriving in the foster home, and they are "receiving the stability and consistency and safety that they need." *Id.* at 59. Ms. Hulek explained that the Children "need and deserve permanency," and that Mother and Father "did not demonstrate that they could provide those things." *Id.* at 59-60.

Mother and Father argue in their respective briefs that at the termination hearing a bond evaluation was not performed by a professional. This Court has held that when evaluating a parental bond, the trial court is not required to use expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). We find that the trial court adequately considered the best interests of the Children and thoroughly contemplated their developmental, physical and emotional needs in determining that Mother's

- 15 -

and Father's parental rights should be terminated pursuant to Section 2511(b), and the record supports the trial court's best interest analysis. *In re C.M.S.*, *supra*.

With the above standard of review in mind, we have thoroughly reviewed the record, the briefs, and the applicable law, and we find no abuse of the trial court's discretion in terminating Mother and Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/2016